PROST, Chief Judge,
dissenting.
At the outset, I share Judge Dyk’s and Judge Reyna’s concerns as to the procedural irregularities surrounding this case at the en banc stage. There was no need to take this case en banc. However, having done so, the en banc court would certainly have benefited from our normal practice of allowing further briefing and argument from the parties and from hearing the views of amici, such as the government.
On the merits, I agree with Judge Dyk that KSR International Co. v. Teleflex Inc. significantly reduced the evidentiary burden necessary to establish a motivation to combine prior art references and held that motivation to combine can be found in “any need or problem known in the field of endeavor,” not just the problem faced by the inventor. 550 U.S. 398, 420, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007). I also agree with his concerns regarding the majority’s elevation of secondary considerations beyond their historic role, which is that secondary considerations take on less importance when, there is little doubt as to obviousness. See Dow Chem. Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973 (1945) (“But these considerations are relevant only in a close case where all other proof leaves the question of invention in doubt.”); Goodyear Tire & Rubber Co. v. *1064 Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721 (1944) (“These factors were entitled to weight in determining whether the improvement amounted to invention and should, in a close case, tip the scales in favor of patentability.”).
Aside from these broader legal principles, though, I write separately to express concern that the majority misapplies the substantial evidence standard of review with respect to the invalidity analysis, finding evidence in the record when there is none to support the jury’s implicit factual findings. With respect to the '647 patent, the majority goes too far by implicitly modifying our prior claim construction that is binding on and agreed upon by the parties.
In the majority’s view, the existence of any evidence that could theoretically support a jury verdict would seem to end our substantial evidence review on appeal. But see Consol. Edison Co. of N.Y. v. Nat’l Labor Relations Bd., 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (“Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.”). Indeed, as Judge Reyna forcefully articulates in his dissent today, the majority has abdicated its role in substantial evidence review. For the additional reasons discussed below, I respectfully dissent.
Discussion
I
A
Under the majority’s analysis, the question with respect to the validity of claim 8 of the '721 patent is -straightforward: whether there is substantial evidence to support the jury’s implicit finding that there was no motivation to combine Neo-node and Plaisant. The en banc majority relies on the testimony of Apple’s expert, Dr. Cockburn, to say that a skilled artisan would not be motivated to combine Neo-node and Plaisant. In support, the en banc majority cites only one fact (that is self-evident from the face of the references themselves): Neonode concerns a portable telephone and Plaisant concerns wall-mounted 'touchscreen devices. That' lone statement does not rise to the level of substantial evidence.
Neonode describes a portable phone that may be activated by “[s]weep[ing] right” on the screen. J.A. 20725. Plaisant discloses a toggle device for use on a touch screen, referred to as a “[sjlider toggle,” which requires a user to slide a pointer from one side of the toggle to the other in order to activate it. J.A. 20743. Plaisant also teaches that an “advantage of the sliding movement is that it is less likely to be done inadvertently therefore making the toggle very secure (the finger has to land on and lift off the right locations).” Id. It is undisputed that Neonode and Plaisant are analogous art references that together disclose all of the limitations of claim 8. The relevant question is whether a skilled artisan would be motivated to combine the references to solve the problem addressed by the '721 patent, namely “the unintentional activation or deactivation of functions due to unintentional contact with the touch screen.”[1] '721 patent col. 1 11. 38-40. *1065 See KSR, 550 U.S. at 420, 127 S.Ct. 1727 (noting that a motivation to combine may be found in “any need or problem known in the field of endeavor at the time of invention and addressed by the patent”).
The majority holds that there is no motivation to combine Neonode with Plaisant because a person of ordinary skill would not turn to Plaisant’s wall-mounted touchscreen to solve the “unintentional activation” problem of a portable phone. The problem with that conclusion is that Apple did not present any evidence to support it. Indeed, a review of the entirety of Dr. Coekburn’s testimony on motivation to combine reveals the striking absence of any evidence that a skilled artisan would not look to Plaisant simply because it discloses wall-mounted touchscreens:
Q. And can you show us, please, using some graphics, remind us what the Plaisant application is.
A. Sure. Quickly I’ve got a few slides on Plaisant, this is the paper, the two-page paper, it describes touch screen toggle designs, so these are on/off switches.

And the way they were intended to be used was the touch screen would be mounted .into a wall or into cabinetry and it would be used to control, for remote control, office or home appliances, like air conditioning units or heaters.

The publication itself and the video that accompanies it both teach away from the use of sliding.... [Plaisant] tells us that toggles that are pushed seem to be preferred over toggles that slide; and the sliding is more complex than simply touching; and also that sliders are harder to implement.
And the figure at the top shows those results for user preference indicating that both of the two designs that they considered, levers and sliders, was the least preferred, that’s the slider highlighted in red and the lever.
Q. [Samsung’s expert] told this jury that a person of ordinary skill in the art would have been naturally motivated to combine the Neonode guide with the Plaisant article.
Did you agree with that opinion?
A. No, I do not.
Q. And why do you say that?
A. The patent office, the patent examiner, had all of the Neonode guide available to them.
They also had Plaisant, in its complete form, available to them, and they commented extensively on Plaisant. There was an extensive discussion of Plaisant, and at the end of that discussion, they conclude that Plaisant does not, or none of the prior art discloses continuous movement of the unlock image to order to unlock the device.
J.A, 12876-78 (emphases added to denote portions of the testimony relied on by the majority).[2]
*1066 Dr. Cockbum’s statement concerning wall-mounted touchscreens did not concern whether a person of ordinaiy skill would look to Plaisant to solve the problem of “unintentional activation”; it was merely a restatement of Plaisant’s express disclosure. See J.A. 20742 (“Users see the screen flushmounted into the wall or the cabinetry.”).[3] Indeed, leaving aside his reference to the entirely discrete issue of teaching away, Dr. Cockburn’s only purported rationale for a lack of motivation to combine was that both Neonode and Plaisant were before the Patent Office during prosecution—a fact that Apple does not rely on before us with respect to motivation to combine.
In stark contrast, the jury heard compelling evidence that a skilled artisan would be motivated to combine the references to solve the problem of unintentional activation. Most importantly, Plaisant itself expressly teaches that an “advantage of the sliding movement is that it is less likely to be done inadvertently.” J.A. 20743. Indeed, this disclosure alone does more than motivate the combination of Plaisant with Neonode—it actually teaches and suggests it.
Samsung’s expert, Dr. Greenberg, explained this to the jury when asked whether a skilled artisan would be motivated to combine the references:
They both specifically describe how a sliding action is used to prevent accidental activation.
So this is—you know, a person looking at this would just think it natural to combine these two, as well taking the ideas in Plaisant, the slider, and putting them on the Neonode is, is just a very routine thing to think about in terms of interaction design.
J.A. 11982-83. By the end of trial, the jury had thus heard from Samsung’s expert, who articulated a specific motivation to combine based on the explicit disclosure of Plaisant itself, and from Apple’s expert, who gave no explanation as to why a skilled artisan would not be so motivated.
Nonetheless, the majority finds that there is substantial evidence of a lack of motivation to combine. But a reviewing court in our situation must “review the record as a whole,” crediting not only evidence favoring the nonmovant but also “evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.” Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 161, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotation marks omitted). Here, the record as a whole makes clear that a skilled artisan, starting with the portable phone of Neo-node, would have seen a benefit to adding Plaisant’s sliders to solve the accidental activation problem described by the '721 patent.[4] See KSR, 550 U.S. at 424, 127 *1067 S.Ct. 1727. A straightforward evaluation of the entire record compels only one reasonable conclusion—there is a motivation to combine Neonode with Plaisant.
In sum, there is no support in the record for the majority’s conclusion that substantial evidence supports the jury’s implicit factual finding that a person of ordinary skill in the art would not be motivated to combine Neonode and Plaisant. Substantial evidence may be a lenient standard, but it is a standard nonetheless that cannot be met with the stark absence of evidence. Therefore, no rational jury could find that a motivation to combine the references to arrive at the claimed invention was lacking.
B
Despite the majority’s statement that there is no motivation to combine, the majority does not appear to rest its conclusion on that basis. See Majority Op. at 1052. Instead, the majority goes on to state that it considers Plaisant’s teachings, including the reference to “inadvertent activation,” against the evidence of secondary considerations. Id. at 1058-59. It is unclear what analytical framework the majority has adopted in its analysis and whether this goes to the question of motivation to combine. We have only weighed the teachings of a prior art reference related to motivation to combine against each other in the teaching away context. See, e.g., Galderma Labs., L.P. v. Tolmar, Inc., 737 F.3d 731, 739 (Fed. Cir. 2013) (a teaching that a concentration of 0.1% was optimal did not weigh against a teaching that 0.3% concentration was possible); DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1327 (Fed. Cir. 2009) (a teaching expressing a “general preference for an alternative”, did not weigh against a teaching). Doing so as part of the ultimate legal question of obviousness, as the majority does now, is a new approach that neither we nor the Supreme Court has sanctioned.
Given the majority’s conclusion (with which I disagree) that there was no motivation to combine references in this case, there is no reason for the majority to go on to opine on the question of secondary considerations at all—that discussion is arguably dicta.[5] See, e.g., Allergan, Inc. v. Sandoz Inc., 796 F.3d 1293, 1304-07 (Fed. Cir. 2015) (affirming a nonobvious determination based only on issues of teaching away and unexpected results); Stryker Corp. v. Zimmer, Inc., No. 2013-1668, 837 F.3d 1268, 1277-78, 2016 WL 4729504, at *7 (Fed. Cir. Sept. 12, 2016) (declining to reach secondary considerations in reaching a determination of nonobviousness), vacated and remanded on other grounds sub nom. Halo Elecs., Inc. v. Pulse Elecs., Inc., — U.S. -, 136 S.Ct. 1923, 195 L.Ed.2d 278 (2016); In re Fine, 837 F.2d 1071, 1076 (Fed. Cir. 1988) (same).
In my analysis, however, I conclude that no reasonable jury could find a lack of motivation to combine, so I am obligated to *1068 consider Apple’s proffered evidence of secondary considerations. Nike, Inc. v. Adidas AG, 812 F.3d 1326, 1339 (Fed. Cir. 2016).
In the history of our court, we have only once held that evidence of secondary considerations outweighs strong evidence of obviousness. See Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc., 699 F.3d 1340 (Fed. Cir. 2012). In that case, the jury, in view of “compelling” evidence, made express findings that seven types of secondary considerations supported nonobviousness. Id. at 1349, 1354. However, we acknowledged that “[f]ew cases present such extensive objective evidence of nonobviousness, and thus we have rarely held that objective evidence is sufficient to overcome a prima facie case of obviousness.” Id. at 1354. This is not a case where evidence of secondary considerations is so “extensive.” See KSR, 550 U.S. at 426, 127 S.Ct. 1727 (“Like the District Court, finally, we conclude Tele-flex has shown no secondary factors to dislodge the determination that claim 4 is obvious.”).
When examining evidence of secondary considerations, “courts must exercise care in assessing proffered evidence of objective considerations, giving such evidence weight only where the objective indicia are attributable to the inventive characteristics of the discovery as" claimed in the patent.” In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig., 676 F.3d 1063, 1079 n.6 (Fed. Cir. 2012) (internal quotation marks omitted) (citations omitted). The proponent of such evidence of secondary considerations, in this case Apple, “bears the burden of showing that a nexus exists between the claimed features of the invention and the objective evidence offered to show non-obviousness.” WMS Gaming, Inc. v. Int’l Game Tech., 184 F.3d 1339, 1359 (Fed. Cir. 1999). Though the existence of such a nexus is a question of fact, which we review for substantial evidence, the consideration of objective indi-cia is part of the ultimate determination of obviousness which we review de novo. See Agrizap, Inc. v. Woodstream Corp., 520 F.3d 1337, 1344 (Fed. Cir. 2008) (“Even when we presume the jury found that the objective evidence of nonobviousness favored [the patentee], this evidence is insufficient to overcome the overwhelming strength of [the alleged infringer’s] prima facie case of obviousness.”); Leapfrog Enters., Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1162 (Fed. Cir. 2007) (agreeing with the district court’s conclusion that even substantial evidence of various secondary considerations was “inadequate to overcome” obviousness as a matter of law). The mere existence of evidence of secondary considerations does not control the obviousness determination. Richardson-Vicks Inc. v. Upjohn Co., 122 F.3d 1476, 1483 (Fed. Cir. 1997).
In this case, Apple presented evidence that it contends shows there was commercial success, long-felt need, industry praise, and copying. However, Apple’s evidence of commercial success does not establish a nexus with the patented feature, and the remaining evidence, even if a nexus is assumed, is not sufficient to “tip the scales of patentability.” Graham v. John Deere Co., 383 U.S. 1, 36, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).
1
To argue commercial success on appeal, Apple only relies on a portion of a survey introduced to establish the value of the “patent-related” slide-to-unlock feature on tablets with screens larger than 7 inches, J.A. 21066, 21108, coupled with Dr. Green-berg’s statement that “there’s no question that the Apple iPhone was a commercial success.” j.A. 11984; see Apple Br. 29. This *1069 evidence does not establish a nexus for commercial success.[6]
With respect to the survey, it did not ask about the slide-to-unlock feature on smartphones, which in the survey had screens no larger than 5.5 inches (smaller than the surveyed tablet screens). J.A. 21076, 21108. Apple does not point to any separate evidence regarding the sales of those tablets. As for the success of the iPhone device, there is no evidence tying that success specifically to the features embodied in the claimed invention. To establish the requisite nexus, there needs to be some record evidence to tie the commercial success of a product to the slide-to-unlock feature of that product embodying the claimed invention. Here, there is none.
In addition, although Dr. Greenberg testified that the iPhone was commercially successful, he continued: “[b]ut I’ve seen no evidence that says that that commercial success was due to the lock screen.” J.A. 11985. No reasonable juror could conclude that Dr. Greenberg’s statement that he had seen no evidence of a nexus was somehow evidence of a nexus.[7]
; 2
The remainder of Apple’s secondary consideration arguments consists of long-felt need, industry praise, and copying. To show long-felt need, Apple relies on the testimony of Dr. Cockburn, who provided a single example of a portable phone that he characterized as “entirely unintuitive.” J.A. 10638-39. For industry praise, Apple relies upon the audience reaction at the first public unveiling of the iPhone. J.A. 12879-80. Finally, Apple relies on internal Samsung documents that it argues show both copying and industry praise. See, e.g., J.A. 51289.[8]
Even assuming that the. jury implicitly found a nexus between Apple’s evidence and the claimed invention, this evidence is insufficient in the face of the strong evidence of obviousness. The testimony of an expert testifying as to a single example of unsatisfactory prior art is, at best, weak. Cf. Cyclobenzaprine, 676 F.3d at 1083 (testimony regarding an expert’s experience over ten years). Similarly, Apple’s evidence of applause at its own press event is also weak evidence of nonobviousness. See In re Cree, 818 F.3d 694, 702 (Fed. Cir. 2016) (finding a company’s press release unpersuasive evidence of nonobviousness). Final *1070 ly, though Samsung’s internal documents are probative of copying (and industry praise), they do not move the needle in this case. See Tokai Corp. v. Easton Enters., Inc., 632 F.3d 1358, 1370 (Fed. Cir. 2011) (finding evidence of copying unpersuasive evidence of nonobviousness).
Considering the totality of the evidence, Apple’s evidence relating to secondary considerations does not “tip the scales of pat-entability.” Graham, 383 U.S. at 36, 86 S.Ct. 684; see also Leapfrog Enters., 485 F.3d at 1162 (finding substantial evidence of commercial success, industry praise, and long-felt need insufficient to overcome strong evidence of obviousness); Richardson-Vicks, 122 F.3d at 1483 (“Evidence of secondary considerations ... are but a part of the ‘totality of the evidence’ that is used to reach the ultimate conclusion of obviousness.”). The asserted claim of the '721 patent is therefore obvious as a matter of law.[9]
II
With respect to the '172 patent, the majority also errs in finding substantial evidence in support of the jury determination that the '172 patent is nonobvious. Specifically, the majority’s conclusion regarding the scope and content of the prior art relies entirely on out-of-context statements by Dr. Cockburn.
The '172 patent is directed to methods of automatically correcting typographical errors as the user is typing on the keyboard of a portable device. In essence, asserted claim 18 of the '172 patent requires that a current “character string,” or text, be displayed in a “first area;” that the text, as typed, and suggested “replacement” text be displayed in a second area; and that the replacement text be automatically entered in the first area if a certain key, such as the space bar, is pressed or if the user touches the suggested replacement. Additionally, the user can choose to use the current text (as typed) if he touches that option in the second area.
Samsung presented evidence at trial through its expert, Dr. Wigdor, that claim 18 of the '172 patent is obvious in light of the Robinson and Xrgomics prior art references. Robinson describes a touchscreen keyboard that can automatically correct incorrectly typed text. Dr. Wigdor opined that Robinson discloses every aspect of the invention except for displaying incorrectly typed text in a “first area.” For that missing limitation, he explained that “anyone who’s used a computer since the late 1970s would be familiar with this idea that ,.. as you type, the text shows up at your cursor.” J.A. 12025. In addition, he pointed to Xrgomics, which describes a text-entry system in which the current character string is displayed in a first area. J.A. 21049.
The majority does not point to any evidence that Xrgomics fails to disclose displaying current text in a first area, nor *1071 could it because Xrgomics plainly discloses that limitation. See J.A. 12025-26. Rather, the majority concludes, based on Dr. Cock-burn’s testimony, that there is substantial evidence that neither Robinson nor Xrgomics discloses the text replacement recited by the asserted claim, as distinguished from text completion. That is demonstrably incorrect, at least with respect to Robinson.
Dr. Cockburn testified primarily that Robinson fails to disclose displaying current text in a “first area.”'He then'used that statement to conclude that Robinson also lacks “a series of [other] elements” recited by the asserted claim, namely replacing or keeping current text in a first area. J.A. 12915-16. In context, Dr. Cock-bum’s testimony about Robinson’s missing elements was entirely premised on the absence of a single element—i.e., no text being displayed in a first area:
[B]ecause the current character string is not in the first area, it is not replaced with the suggested replacement character when the user presses a delimiter. As you saw, there was no text there {in the first area] to be replaced when a delimiter was pressed.
Similarly, the character—current character string is not in the first area, so it can’t be replaced when the user selects a suggested replacement string.
And, again, because the current character string is not there [in the first area], it can’t be kept if the user performs a gesture.
J.A. 12916 (emphases added). To be clear, he did not testify that Robinson fails to disclose replacing or keeping text per se, but only that it fails to disclose replacing or keeping text in a first area.
Indeed, there can be no genuine dispute that Robinson discloses replacing or keeping, in a different area of a display, text that the user has input. Robinson is titled “Keyboard System with Automatic Correction.” J.A. 20885 (emphasis added). And, as explained by Dr. Wigdor, Figure IB of the patent shows that a pop-up menu includes the text as typed and suggested replacement text:
[[Image here]]
*1072 J.A. 20890. Robinson states that “[t]he space key acts to accept the default word ... and enters the [default] word ... in the text output region.” J.A. 20925 (col. 33 11. 12-14). In addition, it is possible to “[s]elect[ ] the [text as typed] for output.” Id. (col. 18 1.10).
Again, Xrgomics plainly supplies Robinson’s missing limitation of displaying current text in a first area. In light of the record evidence, a reasonable jury would only be able to conclude that taking Robinson and supplying that limitation from Xrgomics would result in the claimed invention. Contrary to the majority’s conclusion, there is no evidence—let alone substantial evidence—to support the jury’s finding that Robinson and Xrgomics, when combined, would not disclose every limitation of the asserted claim.
Although the majority does not address motivation to combine with respect to the '172 patent, I also find no substantial evidence upon which a reasonable jury could decide that motivation was lacking. Samsung’s expert gave unrebutted testimony that “the person of ordinary skill in the art, seeing all of the behaviors in Robinson and understanding how they work, and then seeing how Xrgomics works, would certainly recognize this one missing element that what they type shows up where their cursor is. I believe they would combine it.” Apple Inc. v. Samsung Elecs. Co., No. 5:12-cv-630, Trial Tr. of Apr. 15, 2014 at 2019, ECF No. 1717. Apple offered no expert testimony to the contrary. See id. at Trial Tr. of Apr. 25, 2014 at 2902-06, ECF No. 1927. There is no question that Robinson and Xrgomics address the same problems that arise from typing on a relatively small keyboard. And there is nothing to indicate that the asserted combination does more than yield predictable results. Therefore, the only evidence of record demonstrates that all of the limitations of claim 18 of the 172 patent were known in the prior art, and combining those features to solve a known problem yielded no more than a predictable result. See KSR, 550 U.S. at 416, 127 S.Ct. 1727 (“[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result.”).
With respect to secondary considerations, Apple argues that the success of the accused Samsung devices, coupled with survey evidence that consumers are more likely to buy smartphones with “automatic word correction,” J.A. 21108, is evidence of commercial success. Apple also asserts that an internal Samsung document describing an alternative approach as “jarring,” J.A. 51488, is evidence of industry praise. However, as with the '721 patent, Apple cites no expert or other testimony connecting the survey results to the obviousness inquiry. Furthermore, the survey evidence does not speak to whether a consumer would be more or less likely to buy a device with the specific combination of features recited in claim 18 of the '172 patent. That is, this evidence does not show the required nexus between the patented feature and Samsung’s commercial success. As with the '721 patent, any remaining evidence of secondary considerations here is not sufficient to “tip the scales of patentability.” Graham, 383 U.S. at 36, 86 S.Ct. 684.
Accordingly, the asserted claim of the '172 patent is obvious as a matter of law.
Ill
As for the '647 patent, the crux of the parties’ dispute is the proper application of our construction of the “analyzer server” limitation. We had construed this limitation in another case concerning the same patent to mean “a server routine separate *1073 from a client that receives data having structures from the client.” Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1804 (Fed. Cir. 2014). Our previous construction of “analyzer server” is not at issue on appeal, and the-parties agree that it applies in this case. Samsung does not dispute the construction, and, even if Apple had disagreed with our construction, it is bound by it. See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 318, 328-29, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). The question is whether substantial evidence supports the jury’s finding that, under our construction, the accused instrumentalities meet the requirement for a “server routine separate from a client.”
In addition to Judge Dyk’s analysis with respect to the '647 patent in section VIII parts A and B of his dissent, I would add the following.
' The majority asserts that, in light of the specification, a program that is “structurally separate,” without more, satisfies the “ ‘separate’ requirement.” Majority Op. at 1042. We did not so cabin the word “separate” in our Motorola construction. Because no two program routines may physically occupy the same memory at the same time (i.e., any two separate program routines are, by definition, separate in storage), the majority’s interpretation effectively and erroneously reads “separate” out of our construction. Relatedly, the majority also fails to give effect to the requirement under our construction that the routine is a server routine, not any piece of code. That is significant because we relied in Motorola on the plain meaning of “server,” which entailed a client-server reía-tionship. See Motorola, 757 F.3d at 1304-05.
As applied to the facts of this case, no reasonable juror could conclude that Samsung’s devices embody the “analyzer server” limitation. Apple asserted that pieces of software code stored in “shared libraries” are the “analyzer server” that performs the “detecting” and “linking” functions.[10] Notably, even Apple does not advocate for the majority’s view that, our construction merely requires the shared library code to be “structurally separate.” Apple contends that the accused code is “separate” not only in its location but also in its development and design to be reused across different applications. See Apple Opening & Response Br. 16; Oral Argument at 29:21-30:25, 33:35-34:59, available at http://www.cafc.uscourts.gov/ oral-argument-recordings?title=Apple & field_case_number_value=20151171 & field_date_value2% 5Bvalue% 5D% 5Bdate% 5D.
Crucially, the record lacks substantial evidence that the shared library code of the accused instrumentalities meets our Motorola construction requiring a separate server routine. Regarding the “separate” requirement, there is nothing in our Motorola construction to indicate that the independent development of a program routine or reuse across different applications, relied on by Apple, is relevant. The only arguably relevant evidence that Apple relies on is that the accused applications use the shared library code at a separate location, which, as noted above, is not the only requirement of our construction. Because Apple has not offered sufficient evidence to meet our claim construction, that alone *1074 is sufficient to find noninfringement as a matter of law.
To be sure, Samsung also affirmatively-argued why the shared library code is not “separate.” Contrary to the majority’s assertion, Samsung proffered evidence that the code “does not run on its own.”[11] Samsung Br. 19. Indeed, Apple’s expert admitted that the shared library code is incapable of running “outside of the client application.” J.A. 13054. And, as Samsung points out, Apple did not explain why the shared library code is a “server” routine. See Samsung Br. 18-19, 24. There is simply no evidence that the accused instru-mentalities rely on a client-server architecture.
In sum, Apple’s evidence only shows, in relevant part, that the shared library code is a piece of code located in a separate part of memory that is used by other applications. That is not sufficient under our previous construction of “analyzer server” to prove infringement of the '647 patent as a matter of law. No reasonable jury could conclude otherwise.
Conclusion
For the foregoing reasons, no jury could rationally conclude that the '721 and '172 patents were not obvious, or that Samsung infringed the '647 patent. Therefore, I respectfully dissent.

. Apple also argued at the district court and on appeal that Plaisant teaches away from using sliders because they were “not preferred” over other toggle devices, Apple Br. 27. The majority declined to address teaching away, focusing instead on motivation to combine. The majority states, however, that "even if Plaisant does not teach away, its statements regarding users preferring other forms of switches are relevant to a finding regarding whether a skilled artisan would be motivated to combine tire slider toggle in Plaisant with *1065 the mobile phone in Neonode.” Majority Op. at 1051 n.15. This rationale is new. It was never before the juiy, see J.A. 12876-78, and even Apple does not assert that rationale.
In any event, there is no teaching away here. Though Plaisant notes that sliders may not be preferred, it also describes advantages that sliders have over other toggle methods. J.A. 20743. As a matter of law, “the mere disclosure of more .than one alternative does not amount to teaching away from one of the alternatives where the reference does not criticize, discredit, or otherwise discourage, the solution” presented by the disclosure. Sight-Sound. Techs., LhC v. Apple Inc., 809 F.3d 1307, 1320 (Fed. Cir. 2015) (internal quotation marks omitted) (citation omitted); see also Allergan, Inc. v. Apotex Inc., 754 F.3d 952, 964 (Fed. Cir. 2014) (stating that "mere disclosure of alternative preferences” does not teach away).

. Apple never even argued to the jury that Plaisant's disclosure being a wall-mounted device had any bearing on motivation to combine. See Apple Inc. v. Samsung Elecs. Co., No. 5:12-cv-630, Trial Tr. of Apr. 29, 2014 at 3212-14, ECFNo. 1929.

. The majority only cites Dr. Cockburn’s statement that he did not believe there was a motivation to combine Neonode with Plaisant but not his subsequent explanation. A court may not treat a conclusory answer without any context as evidence. See Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1329 (Fed. Cir. 2001) (holding that concluso-ry statements offered by experts are not evidence).

.Because it is undisputed that Plaisant is analogous art, a hypothetical person of ordinary skill would be aware of it. See Mast, Foos, & Co. v. Stover Mfg. Co., 177 U.S. 485, 494, 20 S.Ct. 708, 44 L.Ed. 856 (1900) (”[I]n determining the question of invention, we *1067 must presume the patentee was fully informed of everything which preceded him, whether such were the actual fact or not.”); Kimberly-Clark Corp. v. Johnson & Johnson, 745 F.2d 1437, 1449-54 (Fed. Cir. 1984) (collecting cases).

. The majority's assessment of secondary considerations also relies on additional evidence that was not presented by Apple to the district court or to us on appeal in opposition to Samsung’s obviousness evidence, and relies on theories that appear nowhere in Apple’s briefs. Compare Majority Op. at 1052-59 -with Apple’s Opp’n to Samsung's Mot. for J. as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b) & Mot. to Am. the J. at 18, Apple Inc. v. Samsung Elecs. Co., No. 5:12-cv-630, ECF No. 1908-03 ("Apple JMOL Opposition”); Apple Br. 29.

. To find a nexus for commercial-success, the majority also relies on testimony by Apple's Senior Vice President of Worldwide Marketing, a television commercial shown to the jury, and additional testimony from Apple’s witness, Mr. Christie. - Majority Op. at 1054-56. Apple did not rely on any of that evidence before the district court in its JMOL opposition or before us on appeal to support a showing of commercial success. See Apple JMOL Opposition 18; Apple Br. 29. These rationales are new. There is no need to reach these arguments ' because they were never made in this appeal.

. Apple also argued before the district court, but not on appeal, that Dr. Cockburn’s testimony was evidence of commercial success for the '721 patent. See Apple JMOL Opposition 18. But Dr. Cockburn only testified that the iPhone was commercially successful, not that the iPhone was commercially successful because of the slide-to-unlock feature. See J.A. 12879 ("Well, clearly there’s been commercial success both of the iPhones that use this invention, and for the devices that have copied the technique.”). This testimony is also insufficient to establish nexus.

.In addition to the evidence cited by Apple and the district court, the majority also relies on additional documentation and testimony regarding alternatives to the iPhone slide-to-unlock feature to support its conclusion on long-felt need. Majority Op. at 1057-58. There is no need.to reach this argument because Apple never cited that evidence before the district court or before us on appeal.

. As a basis for affirmance, the majority implies that it would be inappropriate to "reverse nearly a dozen fact findings.” See Majority Op. at 1039-40. The number of underlying findings to a legal conclusion is irrelevant in a legal analysis. Reversal of a jury finding of nonobviousness, which we have done not infrequently, usually requires by its very nature the explicit or implicit reversal of multiple fact findings. See, e.g., W. Union Co. v. MoneyGram Payment Sys., Inc., 626 F.3d 1361, 1368-1374 (Fed. Cir. 2010) (reversing jury’s implicit factual findings of the scope and content of the prior art, motivation to combine, and evidence of secondary considerations); Ecolab, Inc. v. FMC Corp., 569 F.3d 1335, 1348-50 (reversing a jury determination of nonobviousness and, implicitly, the underlying factual findings); PhannaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1360-67 (Fed. Cir. 2007) (reversing a jury’s implicit factual findings regarding the scope and teaching of the prior art, expectation of success, and secondary considerations).

. According to the parties' experts, a shared library is a collection of code that can be accessed by other applications. J.A. 13054 (Apple's expert); J.A. 11792 (Samsung's expert). At oral argument, Samsung analogized the difference between a seryer and a shared library to the difference between a client asking a reference librarian (the server) to perform a task and a client going to the library and performing a-task by following instructions from a book in the library (the shared library). Oral Argument at 9:24-10:15.

. The majority argues that the jury could have found Samsung’s expert testimony regarding the meaning of “analyzer server” inconsistent, citing the district court’s criticism of the expert. Majority Op. at 1045 n.10. The court’s remarks, however, were not made in front of the jury, and Apple did not argue in its appeal briefing that the expert’s testimony was inconsistent. Therefore, there is no need to address this point. Regardless of the credibility of Samsung’s expert, Apple’s evidence under our previous construction of "analyzer server” is insufficient.